IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN A. ARMATAS, Individually and as Personal Medicare Representative and Executor of the Estate of ALEXANDER E. ARMATAS, | ) ) ) ) ) | CASE NO.  5:19-cv-00349 |
| Plaintiffs, | ) ) | JUDGE JOHN R. ADAMS |
| v. | ) ) | MAGISTRATE JUDGE KATHLEEN B. BURKE |
| AULTMAN HEALTH FOUNDATION, *et al.*, | ) ) ) | **REPORT & RECOMMENDATION** |
| Defendants. | ) | |

## I.    Introduction

This case arises from the hospitalization and death of Alexander E. Armatas

("Alexander") at Aultman Hospital in Canton, Ohio, in late 2014.  Alexander's son, Steven A.

Armatas ("Steven"), filed this action on February 15, 2019, in three capacities: on his own

behalf, as the personal Medicare representative for his father, and as executor of his father's

estate.  Plaintiffs (referred to collectively herein as "Plaintiff") assert 12 state and federal claims

against 14 Defendants.    This case is the re-filing of a case previously filed by Plaintiff in the

Stark County, Ohio, Court of Common Pleas on December 28, 2016.[1]

---

[1] Plaintiff voluntarily dismissed the state court case on February 20, 2018 pursuant to Ohio Civil Rule 41(A)(1)(a). Doc. 1, p. 4, ¶¶ 1-4.  The Complaint filed in this Court added three defendants who were not named in the state court action. Doc. 1, p. 4, ¶ 4.

Pursuant to the Court's referral of this case to the undersigned for general pretrial supervision and issuance of a Report & Recommendation on any dispositive motions (Doc. 45), the undersigned submits this Report & Recommendation regarding the Motion to Dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendants Nihad Boutros, M.D., Eyad Nashawati, M.D., Matthew Knoch, M.D., Jeffrey Miller, M.D., Chadi E. Bouserhal, M.D., and Pulmonary Physicians, Inc. of Canton, Ohio ("PPI") (referred to collectively herein as the "ICU Defendants") (Doc. 24).[2]  Plaintiff filed an opposition to the ICU Defendants' Motion to Dismiss (Doc. 39) and the ICU Defendants filed a reply (Doc. 43).[3]

For the reasons explained in detail below, the undersigned recommends that the Court GRANT in part and DENY in part the ICU Defendants' Motion to Dismiss (Doc. 24).  In summary, the undersigned recommends that all Counts asserted against the ICU Defendants, with the exception of Count II (Wrongful Death), be dismissed.   The Motion to Dismiss should be DENIED as to Count II because the sole basis argued by the ICU Defendants for dismissing that Count, the alleged failure of Plaintiff's affidavit of merit to comply with Ohio Rule of Civil Procedure 10(D)(2), is not available in federal court, as is made clear by *Gallivan v. United States*, --- F.3d ---, 2019 WL 579 WL 5793013 (6th Cir. 2019).

**II.    Plaintiff's Complaint – Allegations against the ICU Defendants**

**A.  Claims Against the ICU Defendants**

Of the 12 Counts in the Complaint, two are asserted against all the ICU Defendants: Count I – Medical Malpractice (Doc. 1, pp. 31-33, ¶¶ 132-143) and Count II – Wrongful Death

---

[2] There are eight Defendants in addition to the six ICU Defendants.  They are: Aultman Health Foundation, Aultman Hospital, and AultCare Insurance (collectively, the "Aultman Defendants"); M. Richard Stjernholm, D.O. and Ohio Physicians Professional Corporation dba Surgical Associates of Canton of OPPC (collectively, the "Stjernholm Defendants"); and Mark N. Rose, Gregory Haban, M.D., and Timothy Regula (collectively, the "Rose Defendants"). Doc. 1.

[3] Plaintiff's motion for leave to file a sur-reply was denied.  Doc. 90.

(Doc. 1, pp. 33-35, ¶¶ 144-155).  Three additional Counts are asserted against individual ICU defendants and/or PPI.  They are Count VI – Fraud, asserted against Defendant Dr. Nashawati and PPI (Doc. 1, pp. 47-49, ¶¶ 217-226); Count VII – Intentional Infliction of Emotional Distress ("IIED"), asserted against Dr. Nashawati, Dr. Miller, Dr. Boutros and PPI (Doc. 1, pp. 49-52, ¶¶ 227-239); and Count VIII – Interference with Business Relations, asserted against Dr. Bouserhal, Dr. Knoch, and PPI (Doc. 1, pp. 52-54, ¶¶ 240-250).

### B.  Factual Allegations

On October 11, 2014, Alexander was rushed to the hospital after suffering a cardiac episode while at home.  Doc. 1, p. 9, ¶ 25.  Alexander was 97 years old at the time he entered the hospital.  Doc. 1, p. 8, ¶ 22.  Alexander remained at Aultman Hospital until his death on December 31, 2014.   Doc. 1, p. 6, ¶ 11.

Steven is the only child of Alexander.  Doc. 1, p. 4, ¶ 5.   Shortly after Alexander's admission, emergency room physicians advised Steven that, due to Alexander having suffered catastrophic injuries and his advanced age, he would likely die in the next three hours.  Doc. 1, p. 9, ¶ 26.

Alexander was transferred from the Emergency Room to the Surgical Intensive Care Unit of Aultman Hospital.  Doc. 1, p. 10, ¶ 30.  The ICU Defendants, by or through PPI,[4] were engaged by Aultman Hospital and granted privileges at Aultman Hospital to oversee medical care and treatment of patients admitted to the Surgical Intensive Care and Medical Intensive Care Units.  Doc. 1, p. 7, ¶ 14.

Steven was exposed to "relentless, overbearing pressure by the named-Defendant physicians and other Aultman personnel to sign a DNR and/or immediately remove Alexander

---

[4] PPI is the entity that employed Drs. Nashawati, Boutros, Miller, Bouserhal, and Knoch and/or the entity of which Drs. Nashawati, Boutros, Miller, Bouserhal, and Knoch were principals or owners.  Doc. 1, pp. 6-7, ¶ 13.

from life support so as to allow him to perish of natural causes, even though he was fully insured and improving during this period of time." Doc. 1, p. 11, ¶ 38. During Alexander's stay at Aultman Hospital, Steven declined to follow recommendations made to him at various times by medical personnel to remove his father from life support. Doc. 1, pp. 10, 13-14, 17, ¶¶ 29, 49-50, 64. The matter of palliative care for Alexander was submitted by Dr. Boutros and his colleagues to the Aultman Hospital Ethics Committee. Doc. 1, pp. 11-12, 13-14 ¶¶ 39, 48-50. The Ethics Committee voted to reject the recommendation of Drs. Boutros and Nashawati and to allow Alexander to continue receiving full-code medical treatment for an indefinite period of time while continuing to monitor the situation. Doc. 1, p. 14, ¶ 50.

Shortly after his father was admitted, Steven became concerned about discoloration developing on his father's right toes and leg. Doc. 1, pp. 11, 15, 24, ¶¶ 34, 54, 56, 101. In November, Dr. Butler, the on-call vascular surgeon, was brought in to see Alexander. Doc. 1, pp. 15-16, ¶¶ 58-60. After examining Alexander, Dr. Butler informed Steven that Alexander's discoloration was dry gangrene setting in and it had the potential of turning into a serious infection but had not yet done so. Doc. 1, p. 16, ¶ 61.

Steven sought out second opinions regarding Alexander's diagnosis and prognosis. Doc. 1, pp. 17-19, 26 ¶¶ 66-74, 109-110. Plaintiff alleges that one or more of the ICU physicians interfered with Steven's attempts to obtain those second opinions regarding his father's medical condition. Doc. 1, pp. 19-20, 26 ¶¶ 75-81, 111-112.

On November 1, 2014,[5] after seeing Alexander, Dr. Miller yelled at Steven, stating "What the hell are you doing?! What the hell are you doing?! You are torturing this man, you are

---

[5] The Complaint indicates that the examination by Dr. Miller occurred on November 1, 2016. Doc. 1, pp. 15-16, ¶ 58. Since Alexander died on December 31, 2014, the reference to 2016 must be a typographical error.

torturing your own father!? What type of person are you?! My mother lived to be 93 and I would never have treated her this way!".  Doc. 1, pp. 15-16, ¶¶ 58-59.

On November 21, 2014, Steven was called to the ICU ward to discuss his father's situation.  Doc. 1, pp. 20-21, ¶ 82.  During that meeting, which was attended by Dr. Grossman, Dr. Nashawati, and Ms. Paumier,[6] Dr. Nashawati "angrily told Plaintiff: 'This situation with your father has gone on long enough.  Before the end of this weekend, you need to either remove your father from life support or have him transferred to another hospital.  Otherwise, first thing Monday morning, the Aultman Hospital Legal Department has authorized a lawsuit to be filed in Probate Court against you and your mother for the purpose of removing you and her as caretakers and appointing a guardian *ad litem* to assume responsibility for your father's care.'" Doc. 1, p. 21, ¶ 83.

On December 17, 2014, Dr. Miller informed Plaintiff that Alexander's care was being transferred to the supervision of Alexander's personal family physicians, Internal Medicine Associates of Canton, Inc. (the "Family Doctors").[7]  Doc. 1, p. 24, ¶ 98.  Dr. Miller advised that the ICU physicians would remain as consultants on Alexander's case and Alexander would remain in the same ICU room and be cared for by the same ICU nurses.  Doc. 1, p. 24, ¶ 99.  On the evening of December 17, 2014, Steven had a photographer take photographs of Alexander's right leg and foot to document the dry gangrene.  Doc. 1, p. 24, ¶ 101.

On December 18, 2014, following an examination of Alexander, Dr. Boutros started screaming at Steven, stating "You say you are this man's son, you should be ashamed calling yourself this man's son, you should be ashamed of yourself; you are a terrible son; look at this

---

[6] Dr. Grossman was an Aultman palliative care specialist and chair of the Aultman Hospital Ethics Committee (Doc. 1, pp. 11, 13 ¶ 39, 49) and Ms. Paumier was the ICU Patient Liaison for Aultman Hospital (Doc. 1, p. 13, ¶ 49).
[7] The Family Doctors were Dr. Robert Sabota, Dr. Kevin Hill, and Dr. Jason Bertram.  Doc. 1, p. 24, ¶ 98.

man's eyes, he is dead; you should be ashamed to call yourself this man's son."  Doc. 1, pp. 24-15, ¶¶ 102-103.

The evening before Alexander's death, Steven and Alexander's wife were called to the hospital by Dr. Bertram, Alexander's attending physician for the evening, who informed them that Alexander's dry gangrene had developed into sepsis and the infection was affecting his bloodstream and vital organs.  Doc. 1, pp. 26-27, ¶ 113.  Steven and his mother returned to the hospital and remained by Alexander's bedside until his death.  Doc. 1, p. 27, ¶ 114.

**III.    ICU Defendants' Motion to Dismiss**

In their Motion to Dismiss, the ICU Defendants argue that Counts I (Medical Malpractice), VI (Fraud), VII (IIED) and VIII (Interference with Business Relations) should be dismissed because they are medical claims barred by the applicable one-year statute of limitations and/or because the affidavit of merit Plaintiff filed fails to satisfy Ohio Civ. R. 10(D)(2).  The ICU Defendants argue that Count II (Wrongful Death) should be dismissed because the affidavit of merit that the Plaintiff filed fails to satisfy Ohio Civ. R. 10(D)(2).

In opposition, Plaintiff argues that Counts VI, VII, and VIII are not medical claims and therefore the one-year statute of limitations does not apply. He also argues that he is entitled to equitable tolling of the one-year statute of limitations for medical claims due to alleged conduct by various defendants and/or their agents that prevented him from obtaining medical records needed to obtain an affidavit of merit as required by Ohio Civ. R. 10(D)(2).  Finally, in response to the ICU Defendants' argument that Counts I and II fail because the affidavit of merit the Plaintiff filed with his Complaint does not satisfy Ohio Civ. R. 10(D)(2), Plaintiff argues that the affidavit of merit satisfies the requirements of that rule.

## IV.    Law and Analysis

In considering a motion to dismiss, a court must accept all well-pleaded factual allegations of the complaint as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, **555**(?) (2007).  However, the court need not "accept as true a legal conclusion couched as a factual allegation." *Id.* (internal citations omitted).  Moreover, to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Id. at 570.  *See also Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (clarifying the plausibility standard articulated in *Twombly*).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  "A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotations omitted).  "When considering a motion to dismiss on the ground of a statute of limitations, the Court must decide whether 'it is apparent from the face of the complaint that the limit for bringing the claim[s] has passed.'" *Vanderbilt Univ. v. Scholastic, Inc.*, 382 F.Supp.3d 734, 761 (2019) (quoting *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (noting alteration in original)).

### A.  Count II – Wrongful Death

The sole basis asserted by the ICU Defendants for dismissal of Count II is that the affidavit of merit filed in connection with the Complaint does not satisfy the requirements of Ohio Civ. R. 10(D)(2).  Ohio Civ. R. 10(D)(2) states that "a complaint that contains a medical claim . . . as defined in R.C. 2305.113, shall be accompanied by one or more affidavits of merit relative to each defendant named in the complaint for whom expert testimony is necessary to

7

establish liability."  Ohio Civ. R. 10(D)(2)(a).  The ICU Defendants argue that Ohio's affidavit of merit requirement applies in federal court.  Doc. 24, pp. 14-18.  Further, they contend that the affidavit of merit submitted by Dr. Zoumberakis on behalf of Plaintiff is deficient, arguing that Dr. Zoumberakis is unqualified to offer standard of care opinions as to the ICU Defendants since he does not practice in the same field as the ICU Defendants, i.e., Dr. Zoumberakis is an emergency-medicine specialist, not a pulmonologist or critical-care specialist.  Doc. 24, pp. 16-18.

At the time the ICU Defendants filed their motion to dismiss, the question whether Ohio's affidavit of merit requirement applies in federal court was pending before the Sixth Circuit in *Gallivan v. United States*, Sixth Circuit Court of Appeals Docket # 18-3874.  *See* Doc. 24, p. 14, n. 6.  On November 7, 2019, the Sixth Circuit decided the issue in a published decision, *Gallivan v. United States*, --- F.3d ---, 2019 WL 579 WL 5793013 (6th Cir. 2019), in which it reversed a district court's order dismissing a case for failure to comply with Ohio Civil Rule 10(D)(2).  The Sixth Circuit observed that, under the Federal Rules, "no affidavit is required to state a claim for medical negligence." *Id.* at * 1.  The Court concluded, "In sum, the district court should have applied the Federal Rules, not Ohio Rule 10(D)(2)." *Id.* at * 2.  In light of the Sixth Circuit's ruling in *Gallivan*, the undersigned recommends that the Court DENY the ICU Defendants' motion to dismiss Count II, Plaintiff's wrongful death claim.

### B.  Count I – Medical Malpractice

The ICU Defendants seek dismissal of Count I on the basis that the affidavit of merit filed by Plaintiff does not satisfy the requirements of Ohio Civ. R. 10(D)(2).  For the reasons explained above in connection with Count II, that argument fails.

The ICU Defendants also argue that Count I should be dismissed because it is barred by the one-year statute of limitations that applies to medical claims under O.R.C. § 2305.113.  That statute permits an extension of the one-year limitations period of up to 180 days if, prior to the expiration of the one-year period, a claimant who has a medical claim provides notice (known as a "180-day letter") to the individual who is the subject of the claim that the claimant is considering bringing an action upon the claim. O.R.C. § 2305.113(B).[8]

Plaintiff does not dispute that his medical malpractice claim in Count I is a "medical claim" under Ohio law.  Doc. 39, p. 13, n. 26.  Alexander's death occurred on December 31, 2014.  Doc. 1, p. 27, ¶ 114.  Plaintiff alleges that he sent 180-day letters to all the ICU Defendants on December 2, 2015.  Thus, under O.R.C. § 2305.113, Plaintiff's medical claims were required to be commenced not later than May 30, 2016, which is 180 days from Plaintiffs' sending of the 180-day letters.[9]  However, Plaintiff did not file his complaint in the Stark County Court of Common Pleas until December 28, 2016, many months after the statute of limitations had run.  The date Plaintiff filed his state court action, not the later date on which this case was filed, is the operative date for determining whether Plaintiff timely filed his Complaint.[10]

**Equitable Tolling**

Plaintiff does not dispute that the claim asserted in Count I was not timely filed under O.R.C. 2305.113.  Instead, he argues that "the defendants' efforts to hinder him [Steven

---

[8] In that event, the limitations period is extended to 180 days after the notice is given. Id.

[9] Plaintiff appears to have mis-counted when he indicated in his opposition brief that the statute expired on June 2, 2016.  Doc. 39, p. 5.

[10] As noted above, this case is a re-filing of the previously filed Common Pleas Court case, which Plaintiff dismissed voluntarily.  Plaintiff claims the benefit of the Ohio savings statute, O.R.C. §2305.19, for the time period between the dismissal of his state court case and the filing of this case.  That statute tolls the running of the statute of limitations for a one year period after a case is dismissed other than on the merits but it applies only where the first filed action was timely commenced.  *See e.g., Moore v. Dept. of Rehab. & Corr.*, 2011 WL 1225466, * 5 (Ohio App. Ct. Mar. 31, 2011).

Armatas] in obtaining his father's medical records interfered with his ability to file his malpractice claims within the time prescribed under R.C. 2305.113(A)." *Id.* Thus, Plaintiff contends that he should be entitled to equitable tolling of the statute of limitations and/or the ICU Defendants should be equitably estopped from asserting a statute of limitations defense. Doc. 39, pp. 10-11.

As set forth above, Plaintiff initially filed his complaint in the Stark County Court of Common Pleas on December 28, 2016. Doc. 1, p. 4, ¶ 1. On February 20, 2018, Plaintiff voluntarily dismissed his state court complaint. Doc. 1, p. 4, ¶ 3. On February 15, 2019, Plaintiff filed this action. Doc. 1.

When a party asserts that he should be entitled to tolling of the statute of limitations and when the claim at issue in federal court arises under state law, state, not federal, tolling principles apply. *See Roberson v. Macnicol*, 698 Fed. Appx. 248, 250 (6th Cir. June 19, 2017). As stated by the Ohio Court of Appeals, Tenth District, "the purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice." *McCualsky v. Appalachian Behavioral Healthcare*, 100 N.E.3d 1049, 1054-1055 (2017) (quoting *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 145 (1990)). "To invoke the doctrine as a bar to statute of limitations defense, however, the plaintiff must be able to show the defendant's specific actions prevented the plaintiff from timely filing." *Id.* at 1055. Additionally, as the Ohio Tenth District Court of Appeals explained, "[e]quitable tolling is only available in compelling cases which justify a departure from established procedure . . . [and therefore] equitable tolling is to be applied sparingly and only in exceptional circumstances." *Id.* (internal citations and quotations omitted). "A litigant seeking equitable tolling must demonstrate that he or she diligently pursued his or her rights, but some extraordinary circumstance stood in his or her way and prevented

timely action." *Id.* (internal citations omitted).  To assess whether equitable tolling is warranted, "courts generally consider: (1) lack of actual notice of the filing requirement, (2) lack of constructive notice of the filing requirement, (3) diligence in pursuing one's rights, (4) absence of prejudice to the defendant, and (5) a plaintiff's reasonableness in remaining ignorant of the filing requirements." *Moore v. Ohio Dept. of Rehab. & Corr.*, 2011 WL 1225466, * 6 (Ohio App. Ct. Mar. 31, 2011).

Plaintiff argues that the ICU Defendants, the Aultman Defendants, and/or their agents engaged in inappropriate conduct that Plaintiff alleges prevented him from meeting the O.R.C. § 2305.113 deadline for filing his medical malpractice claim.  Doc. 39, pp. 5, 7-8, 9-10. Specifically, Plaintiff argues that the ICU Defendants and/or their agents prevented, or assisted other named defendants in preventing, Plaintiff from obtaining Alexander's medical records, which Plaintiff contends in turn prevented him from obtaining the requisite affidavit of merit under Ohio Rule Civ. 10(D)(2) and timely filing his medical malpractice claim.  Doc. 39, p. 9. Plaintiff indicates that, after having to file a state court declaratory judgment action on September 29, 2015,[11] he ultimately received Alexander's medical records on June 10, 2016. Doc. 1, p. 29, ¶ 125; Doc. 39, pp. 7-9.

For the reasons explained below, the undersigned finds that Plaintiff has not demonstrated that the ICU Defendants should be equitably estopped from asserting the statute of limitations as a defense or that equitable tolling of the statute of limitations is warranted.

---

[11] The Complaint states that the DEC action was filed on or about September 23, 2015.  Doc. 1, p. 29, ¶ 125.  The Stark County Court of Common Pleas docket and time stamp on the DEC action show that it was filed on September 29, 2015.  *See*  https://www.starkcjis.org/#/case/detail/CPC/2015CV02003; Doc. 25-3.  Fed. R. Evid. 201(b)(2) allows a court "to judicially take notice of a fact that is not subject to reasonable dispute because it  . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See also e.g.*, *Ashipa v. Warden, Chillicothe Corr. Inst.*, 2009 WL 3152840, *3 (S.D. Ohio Sept. 30, 2009) (taking judicial notice of online docket records available to the public through the internet).

Plaintiff Steven Armatas is an Ohio attorney who brings this action individually and on behalf of the other Plaintiffs.  Plaintiff has not argued nor shown that he lacked actual or constructive knowledge of the applicable statute of limitations.  Plaintiff indicates that he ultimately obtained the medical records on June 10, 2016.  Doc. 39, p. 2.  Yet, he offers no reason for waiting over six months to file his complaint on December 28, 2016.

Plaintiff takes the position that "[f]iling before June 2, 2016, without attaching a proper Affidavit of Merit, would very likely have resulted in his suit being dismissed, and would have *precluded him from ever refiling it*.  While Plaintiff could have requested a 90-day extension, the grant thereof is discretionary with the judge and is often denied in Stark County.  Regardless, Plaintiff should not be penalized for the actions of the defendants."  Doc. 39, p. 9 (emphasis supplied).  Plaintiff's position is not supported by the text of Ohio Civ. R. 10(D)(2)(d), which provides in part that "Any dismissal for the failure to comply with this rule *shall operate as a failure otherwise than on the merits*."  Ohio Civ. R. 10(D)(2)(d) (emphasis supplied).  *See also Troyer v. Janis*, 132 Ohio St.3d 229, 232 (2012) (holding "that a dismissal of a complaint for failure to attach the affidavit of merit required by Civ. R. (10)(D)(2) is an adjudication otherwise than on the merits and is a dismissal without prejudice by operation of law[]").  Thus, if Plaintiff had timely filed his complaint without complying with Ohio Civ. R. 10(D), and the case had been dismissed, the dismissal would have been otherwise than on the merits and Plaintiff would have had an opportunity to refile under Ohio's savings statute.  Thus, Plaintiff's assertion that he would have been precluded from <u>ever</u> refiling is simply incorrect.

Furthermore, Plaintiff acknowledges that a plaintiff may seek an extension of time under Ohio Civ. R. 10(D)(2) to file an affidavit of merit but he failed to seek such an extension before the statute of limitations expired.  Doc. 39, p. 9.  Plaintiff's explanation for not seeking an

extension of time while he was actively seeking medical records through a declaratory judgment action in state court is that "the grant [of an extension of time] is discretionary with the judge and is often denied in Stark County." Doc. 39, p. 9. Plaintiff's position in this regard is undercut by the fact that, when Plaintiff ultimately filed suit on December 28, 2016, he sought and was granted an extension of time to file an affidavit of merit.[12] Moreover, Ohio Civ. R. 10(D)(2) provides that an extension of time to file an affidavit of merit may be granted beyond 90 days "if the court determines that a defendant or non-party has failed to cooperate with discovery or that other circumstances warrant extension." *See* Ohio Civ. R. 10(D)(2)(b). Thus, not only could Plaintiff have requested an initial 90-day extension, he also could have sought extensions beyond 90 days. Plaintiff's failure to seek any extension of time to file an affidavit of merit before the statute of limitations expired denotes a lack of due diligence.

Moreover, as noted above "[t]o invoke the doctrine [of equitable estoppel] as a bar to statute of limitations defense, . . . the plaintiff must be able to show the defendant's specific actions prevented the plaintiff from timely filing." *McCualsky*, 100 N.E.3d at 1055. And, "equitable tolling is to be applied sparingly and only in exceptional circumstances." *McCualsky*, 100 N.E.3d at 1055. Here, since Plaintiff did not avail himself of available avenues for seeking extensions of time to file an affidavit of merit before the limitations period expired, he cannot show that it was the actions of defendants that prevented him from timely filing. Additionally, this case is distinguishable from the cases cited by Plaintiff because there is no indication that the ICU Defendants made misrepresentations that induced Plaintiff to delay filing his claims. *Cf.*

---

[12] The Stark County Court of Common Pleas' docket, Case No. 2016CV02801, reflects that on January 27, 2017, the court granted a motion for extension of time to file an affidavit of merit until March 28, 2017, and a "notice of filing of certificate of merit with proof of service" was filed March 23, 2017. *See* https://www.starkcjis.org/#/case/detail/CPC/2016CV02801.

*Walworth v. B.P. Oil Co.*, 112 Ohio App.3d 340, 348 (1996) (cited by Plaintiff (Doc. 39, pp. 10-11, n. 24)) (observing that the doctrine of estoppel was applied to bar an insurance company from asserting statute of limitations as a defense where the insurance company, being aware of the date of an accident, misrepresented that date to the plaintiff's attorney who had informed the insurance company that he was relying on the insurance company's representation); *Helman v. EPL Prolong, Inc.*, 139 Ohio App.3d 231, 246 (2000) (cited by Plaintiffs (Doc. 39, pp. 10-11, n. 24)) (discussing elements of equitable estoppel and indicating that, "in the context of a statute-of-limitations defense, a plaintiff must show either 'an affirmative statement that the statutory period to bring an action was larger than it actually was' or 'promises to make a better settlement of the claim if the plaintiff did not bring the threatened suit' or 'similar representations or conduct' on defendant's part[]") (internal citations omitted).

Plaintiff's allegations that defendants or their agents were involved in attempting to hinder Plaintiff's ability to obtain medical records does not absolve Plaintiff from exercising due diligence. The undersigned does not find that exceptional circumstances exist that would warrant the application of equitable tolling. Thus, the undersigned recommends that the Court GRANT the ICU Defendants' motion to dismiss Count I as barred by the statute of limitations.

### C. Counts VI (Fraud), VII (IIED) and VIII (Interference with Business Relations)

The ICU Defendants argue that Counts VI (Fraud), VII (IIED) and VIII (Interference with Business Relations) should be dismissed because they are "medical claims" under O.R.C. § 2305.113 and therefore are barred by the statute of limitations contained in that statute. Doc. 24, pp. 3-5, 6-7, 8-11. In response, Plaintiff contends that the Fraud, IIED, and Interference with Business Relations claims are not "medical claims" and therefore are not subject to the statute of limitations for medical claims contained in O.R.C. § 2305.113. Doc. 39, pp. 11-17.

To determine the applicable statute of limitations, "courts must look to the actual nature or subject matter of the case, rather than the form in which the action is pleaded." *Freeman v. Durrani*, 2019-Ohio-3643, 2019 Ohio App. LEXIS 3732, * 7 (Ohio App. Ct. Sept. 11, 2019) (quoting *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183 (1984)).

O.R.C. § 2305.113 states:

"Medical claim" means any claim that is asserted in any civil action against a physician, podiatrist, hospital, home, or residential facility, against any employee or agent of a physician, podiatrist, hospital, home, or residential facility, or against a licensed practical nurse, registered nurse, advanced practice registered nurse, physical therapist, physician assistant, emergency medical technician-basic, emergency medical technician-intermediate, or emergency medical technician-paramedic, and that arises out of the medical diagnosis, care, or treatment of any person.

O.R.C. § 2305.113(E)(3). The statute also provides that "medical claim" includes "[d]erivative claims for relief that arise from the medical diagnosis, care, or treatment of a person[.]" O.R.C. § 2305.113(E)(3)(a).

Thus, while Plaintiff's claims in Counts VI-VIII are not pleaded as medical malpractice claims, they may nevertheless be subject to the statute of limitations contained in O.R.C. 2305.113 if they are "medical claims" under that statute. As explained below, the undersigned finds that the claims asserted in Counts VI, VII, and VIII are "medical claims" under O.R.C. 2305.113 and therefore are barred by the statute of limitations.

### 1. Count VI - Fraud

In Count VI, which is asserted against Defendant Dr. Nashawati and PPI (Doc. 1, pp. 20-22, 47-49, ¶¶ 82-89, 217-226),[13] Plaintiff alleges:

219. As more fully described in paragraphs 88 through 89 above, on or about November 21, 2014, Defendant Dr. Nashawati told Plaintiff that unless he removed his father from life support or transferred him to another hospital within the next 48

---

[13] Count VI also contains allegations of fraud against the Aultman Defendants which are not addressed in this Report and Recommendation.

hours, Aultman Hospital would commence a lawsuit in the Stark County Probate Court "first thing on Monday" to have Plaintiff and his mother removed as his father's caretakers and be replaced by a guardian *ad litem*. Based on information and belief, Plaintiff hereby alleges that no such lawsuit had ever been discussed between Dr. Nashawati and the Aultman Hospital Legal Department and no such legal action had ever been contemplated, discussed or authorized by Aultman or AHF.

220. In making such threats, Dr. Nashawati made misstatements of material fact, which he knew to be false, on which Dr. Nashawati intended for Plaintiff to rely, on which Plaintiff did justifiably rely, and pursuant to which Plaintiff was harmed by his reliance thereon.

Doc. 1, pp. 47-48, ¶¶ 219-220.

In paragraphs 88 and 89, referenced in Count VI, Plaintiff alleges:

88. Based on information and belief, Plaintiff hereby alleges the statements made by Dr. Nashawati to him on November 21, 2014, were knowingly and intentionally false and uttered for the purpose of intimidating Plaintiff and frightening him into doing what Dr. Nashawati, Dr. Stjernholm and the other ICU Doctors wanted; namely for Plaintiff to remove his father from life support in order for Alexander to die before sepsis could develop in his right leg, thus covering up such Defendants' negligence regarding the treatment of his leg.

89. Despite the importance and nature of this meeting between Plaintiff and Dr. Nashawati, Dr. Grossman and Ms. Paumier, no record of its occurrence or the matters discussed thereat were entered into the daily progress report charts for Alexander, or if so entered, were later deleted.

Doc. 1, p. 22, ¶¶ 88-89.

Despite Dr. Nashawati's alleged statements, Alexander was not removed from life support or moved to another hospital and Steven and his mother were not removed as Alexander's caretakers. *See* Doc. 1, pp. 21, 24, 26-27, ¶¶ 86, 98-99, 113-114.

A misrepresentation made during the course of medical treatment may, but does not always, give rise to a separate cause of action in fraud independent from a medical practice action. *Compare Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55-56 (1987) (finding a separate fraud action as distinct from a medical malpractice claim) *with Young v. UC Health,*

*West Chester Hosp., LLC*, 61 N.E.3d 34, (Ohio App. Ct. 2016) (finding a claim for fraud to be a medical claim).

In *Gaines*, relied upon by Plaintiff, the plaintiff had consulted a physician for the purpose of having her pregnancy terminated and her IUD removed.  *Gaines*, 33 Ohio St.3d at 56. Following surgery, plaintiff was informed that her IUD had been removed when it had not been. *Id.*  The plaintiff experienced abdominal pain and her uterus became perforated and embedded in her left ligament. *Id.*  The Supreme Court of Ohio concluded that, "[a] physician's knowing misrepresentation of a material fact concerning a patient's condition, on which the patient justifiably relies to his detriment, may give rise to a cause of action in fraud independent from an action in medical malpractice." *Id.*  The court explained further that a "fraud action is separate and distinct from [a] medical malpractice action which stems from the surrounding facts where the decision to misstate the facts cannot be characterized as medical in nature." *Id.*  Considering the case before it, the court concluded that it could not "be said that the statement to appellant that her IUD had been removed when in fact it had not was motivated by any medical consideration." *Id.*  And, "[r]easonable minds could certainly conclude that the misstatement in the instant cause was prompted not by medical concerns but by motivations unrelated to and even antithetical to appellant's physical well-being." *Id.*  Thus, the court found that the plaintiff's complaint stated a fraud cause of action separate from the medical malpractice cause of action. *Id.* at 55-56.

In contrast, in *Young*, relied upon by Dr. Nashwati and PPI, the plaintiff had consulted the defendant physician, Dr. Durrani, regarding neck and back pain.  *Young*, 61 N.E.3d at 37. Dr. Durrani performed surgeries on plaintiff's neck and back. *Id.*  The plaintiff's pain persisted following surgery and she requested that Dr. Durrani remove the hardware he had inserted

during surgery but Dr. Durrani allegedly refused and the plaintiff eventually filed suit contending that the surgeries were not medically necessary and were improperly performed. *Id.* While preparing to file her lawsuit, the plaintiff learned that Dr. Durrani had used a bone morphogenetic protein product—Infuse/BMP-2—without her consent and used it in a way not approved by the Food and Drug Administration, which plaintiff alleged could cause uncontrolled bone growth around the spinal cord and lead to pain, spasms and paralysis. *Id.* The plaintiff asserted that the hospital concealed the use of the Infuse/BMP-2 and did not disclose its use in the consent form. *Id.* at 42. The complaint alleged that the hospital had "intentionally concealed and/or misrepresented material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery." *Id.* Considering the matter before it, the court of appeals concluded that the plaintiff's allegation was "simply an attack on Dr. Durrani's 'medical diagnosis' and an allegation of lack of informed consent[]" and, therefore, was a medical claim. *Id.* (discussing and relying on *Hensley v. Durrani*, 1st Dist. Hamilton No. 130005, 2013-Ohio-4711).

In a more recent case, a plaintiff claimed that her physician had "committed fraud by misinforming her about the outcome of the surgery and concealing information to avoid civil liability[]" and argued that *Gaines* controlled the outcome. *Freeman*, 2019 Ohio App. LEXIS 3732, * 9. The First District Court of Appeals disagreed, concluding that "[u]nlike the physician in *Gaines*, we cannot say that [the physician's] decision to misstate the facts was not 'motivated by *any* medical consideration' or medical concerns." *Id.* at * 10 (emphasis in original).

Plaintiff's fraud claim against Dr. Nashawati and PPI is premised on the following statement allegedly made by Dr. Nashawati:

> Dr. Nashawati angrily told Plaintiff: "This situation with your father has gone on long enough. Before the end of this weekend, you need to either remove your father

18

> from life support or have him transferred to another hospital.  Otherwise, first thing Monday morning, the Aultman Hospital Legal Department has authorized a lawsuit to be filed in Probate Court against you and your mother for the purpose of removing you and her as caretakers and appointing a guardian *ad litem* to assume responsibility for your father's care.

Doc. 1, p. 21, ¶ 83.

Plaintiff alleges that Dr. Nashawati knowingly threatened legal action that had never been contemplated, discussed or authorized by Defendants Aultman or AHF, on which Dr. Nashawati intended for Plaintiff to rely, and upon which Plaintiff did rely to his detriment.  Doc. 1, pp. 47-48, ¶¶ 219-220.  Plaintiff contends that, as in *Gaines*, Dr. Nashawati's motivations for his statements were "clearly 'unrelated and even antithetical to the appellant's physical well-being'" because his motivations involved covering up the ICU Defendants' negligence in not properly treating Alexander's leg when they had the chance.  Doc. 39, p. 14.  The undersigned disagrees.  Dr. Nashawati's statements pertained to medical decision making, including removal from life support or transfer to another facility or, alternatively, the possibility of someone else being put in place "to assume responsibility for [Alexander's] *care*."  Doc. 1, p. 21, ¶ 83 (emphasis supplied).  Dr. Nashawati's statement cannot be said to be unrelated to or unmotivated by any medical considerations.  Accordingly, the undersigned recommends that the Court GRANT the ICU Defendants' motion to dismiss as to Count VI because, although labeled a fraud claim, it is a "medical claim" under Ohio law and is therefore barred by the statute of limitations contained in O.R.C. § 2305.113.

Alternatively, assuming arguendo that the claim in Count VI is not deemed a "medical claim," Count VI should be dismissed for failure to state a claim for fraud.  A claim for fraud in Ohio has the following six elements:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its

19

falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*State ex rel. Seibert v. Richard Cyr, Inc.*, --- N.E.3d ---, 2019 WL 3948996, *7, 2019-Ohio-3341

(2019) (quoting *Gaines*, 33 Ohio St.3d at 55).  Plaintiff alleges the elements of fraud in a

conclusory fashion, stating:

> In making such threats, Dr. Nashawati made misstatements of material fact, which he knew to be false, on which Dr. Nashawati intended for Plaintiff to rely, on which Plaintiff did justifiably rely, and pursuant to which Plaintiff was harmed by his reliance thereon.

Doc. 1, p. 48, ¶ 220.

The "[f]actual allegations [of a pleading] must be enough to raise a right to relief above

the speculative level." *Twombly*, 550 U.S. at 555.  While a court must accept all well-pleaded

factual allegations as true, it need not "accept as true a legal conclusion couched as a factual

allegation." *Id.* (internal citations omitted).  "A plaintiff's obligation to provide the grounds of

his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of

the elements of a cause of action will not do." *Id.* (internal quotations omitted).

Here, even assuming arguendo that Plaintiff's Complaint sufficiently states facts as to the

first four elements of fraud, the Complaint states only a formulaic recitation of the remaining two

elements: namely, justifiable reliance on the alleged material misrepresentation and resulting

injury caused by reliance thereon.  The Complaint does not allege how Plaintiff relied on Dr.

Nashawati's allegedly false statement that Aultman Hospital was planning to file a probate court

action if Alexander's son and wife did not remove him from life support or transfer him to

another hospital nor does it state how Plaintiff was harmed thereby.  In fact, Alexander's family

did not remove him from life support or transfer him to another hospital following Dr. Nashawati's allegedly false statement.

Based on the foregoing, the undersigned recommends that the Court GRANT the ICU Defendants' motion to dismiss Count VI. The Court should dismiss Count VI because, although labeled a fraud claim, it is a "medical claim" and is therefore barred by the statute of limitations contained in O.R.C. § 2305.113. Alternatively, even if Count VI is found to be a fraud claim, the Court should dismiss Count VI for failure to state a claim for fraud.

### 2. Count VII – IIED

In Count VII, which is asserted against Dr. Nashawati, Dr. Miller, Dr. Boutros and PPI (Doc. 1, pp. 49-52, ¶¶ 227-239), Plaintiff alleges:

> 229. As more fully described in paragraphs 88 through 89 above, Dr. Nashawati made certain false statements to Plaintiff shortly after 5:00 p.m. on November 21, 2014 in the presence of Dr. Grossman and Ms. Paumier regarding Aultman Hospital's alleged imminent plans to sue Plaintiff and his mother in order to have them removed as Alexander's caretakers and replaced with a guardian *ad litem*.
>
> ***
>
> 231. As more fully described in paragraphs 58 to 60 above, on November 1, 2014, Dr. Miller made certain loud, insulting and inflammatory statements to Plaintiff, in the presence of nurses, related medical staff, and other patients and their family members, accusing Plaintiff of "torturing his own father."
>
> ***
>
> 233. As more fully described in paragraphs 102 to 107 above, on or about December 18, 2014, Dr. Boutros made certain loud, insulting and inflammatory statements to Plaintiff in the presence of Plaintiff's godfather and several other physicians, nurses, administrators and other medical staff, to the effect that Plaintiff should be ashamed to call himself Alexander's son.

Doc. 1, pp. 49-50, ¶¶ 229, 231, 233.

Ohio courts have found intentional infliction of emotional distress claims that arise out of a defendant's "medical diagnosis, care, or treatment" of an individual to be "medical claims"

under O.R.C. § 2305.113(E)(3).  *See e.g.*, *Crissinger v. The Christ Hosp*., 106 N.E.3d 798, 804 (Ohio App. Ct. 2017); *Singh v. Cleveland Clinic Found*., 2013-Ohio-2465, 2013 Ohio App. LEXIS 2411, * 4-7 (Ohio App. Ct. June 13, 2013); *Butler v. Jewish Hosps*., 1995 Ohio App. LEXIS 1787, * 2-3 (Ohio App. Ct. May 3, 1995).

In *Butler*, the court concluded that a plaintiff's intentional infliction of emotional distress claim that was premised on a nurse "blurting out" within the plaintiff's hearing that the plaintiff's spouse had died when he had not actually died was a "medical claim."  1995 Ohio App. LEXIS 1787, *2-3.  In reaching its decision, the court rejected plaintiff's argument that her claim was not a "medical claim" because she was not the patient.

In *Singh*, the plaintiffs alleged that the defendants had caused them emotional distress by improperly informing Ms. Kaur, the wife of Mr. Singh, the patient, that there was nothing further that could be done to save her husband and it was therefore appropriate to remove him from life support.  *Singh*, 2013 Ohio App. LEXIS 2411, * 2.  Plaintiffs contended that this advice was incorrect because the patient was ultimately moved to another hospital at his wife's insistence where he was treated and recovered.  *Id.*  Relying in part on *Butler*, the court concluded that the plaintiffs' "claim for emotional distress arose out of defendants' medical care and treatment of Singh" and therefore was a derivative claim subject to O.R.C. § 2305.113.  *Id.* at *2-7.

*Crissinger* was one of many cases in which it was alleged that a physician, Dr. Durrani, and various hospitals, convinced plaintiffs to undergo unnecessary spinal surgery, improperly performed the surgery, used "off-label" implants that caused further problems, and covered up his actions through fraud and destruction of evidence.  106 N.E.3d at 801.  One of the claims at issue in *Crissinger* was an IIED claim, in which it was alleged that "Dr. Durrani's conduct as described in the complaint was intentional and reckless.  It is outrageous and offends against the

generally accepted standards of morality."  *Id.* at 804.  In reversing the trial court's ruling

denying defendants' motion to dismiss, the Ohio appellate court concluded that the intentional

infliction of emotional distress claim was a "medical claim" because it "arose out of the medical

diagnosis, care, or treatment of the plaintiffs."  *Id.*

Plaintiff argues that the IIED claims are personal to Steven because the physicians

directly screamed at, berated and humiliated him "simply because he had the temerity to question

their [the physicians'] judgment."  Doc. 39, p. 15.  However, as indicated in *Butler*, the fact that

a claim is asserted by a non-patient does mean the claim is not a "medical claim."  1995 Ohio

App. LEXIS at * 3.

Furthermore, the factual allegations in Plaintiff's Complaint demonstrate that the IIED

claims arose from the diagnosis, care or treatment provided to Alexander by Drs. Nashawati,

Miller, and Boutros.  For example, Dr. Miller's alleged statements were made following his

examination of Alexander.  In response to those statements, Steven explained his concerns over

his father's leg and Dr. Miller "relented and instructed his assistant" to contact a vascular

surgeon for a consult.  Doc. 1, pp. 15-16, ¶¶ 58-60.  Dr. Nashawati's alleged statements were

made during a meeting regarding Alexander's situation that was initiated by another doctor – Dr.

Grossman[14] and the statements related to the possibility of someone else assuming responsibility

for Alexander's care.  Doc. 1, pp. 20-21, ¶¶ 82-83.  Dr. Boutros' alleged statements called into

question Steven's decisions regarding his father's care and were made following Dr. Boutros's

examination of Alexander.  Doc. 1, pp. 24-25, ¶¶ 102-103.

Additionally, Plaintiff acknowledges that the statements that are the basis for his IIED

claims against Drs. Nashawati, Miller, and Boutros were made in response to Steven's

---

[14] Dr. Stephen Grossman was an Aultman Hospital palliative care specialist.  Doc. 1, p. 11, ¶ 39.

questioning of the doctors' judgment.  Doc. 39, p. 15.  Plaintiff attempts to distinguish cases cited by Defendants but his attempts fail because the cases are clear that IIED claims found to arise from a defendant's "medical diagnosis, care, or treatment" of an individual are "medical claims" under O.R.C. § 2305.113(E)(3).

Considering the foregoing, the undersigned recommends that the Court GRANT the ICU Defendants' motion to dismiss as to Count VII.  The Court should dismiss Count VII because, although labeled IIED claims, they are "medical claims" and are therefore barred by the statute of limitations contained in O.R.C. § 2305.113.

### 3.  Count VIII – Interference with Business Relations

Count VIII is asserted against Dr. Bouserhal, Dr. Knoch, and PPI.  Plaintiff alleges interference by Dr. Bouserhal and Dr. Knoch with Plaintiff's contract or valid business expectancy with Drs. DeGeorgia and Hoeprich regarding those doctors providing second opinions regarding Alexander's care.  Doc. 1, pp. 17-19, 52-54, 26-27, ¶¶ 66-78, 109-113, 240-250.

Neither party cites to cases directly addressing whether an interference with business relations claim can amount to a "medical claim" under O.R.C. § 2305.113(E)(3).  Based on the allegations of the Complaint, the undersigned finds that the Interference with Business Relations claims asserted against Drs. Bouserhal and Knoch arise out of the "medical diagnosis, care, or treatment" of Alexander and therefore are "medical claims" under O.R.C. § 2305.113(E)(3).  Accordingly, the undersigned recommends that the Court GRANT the ICU Defendants' motion to dismiss Count VIII because the claims are "medical claims" and are therefore barred by the statute of limitations contained in O.R.C. § 2305.113.

## V.      Conclusion and Recommendation

For the reasons discussed herein, the undersigned recommends that the Court GRANT in part and DENY in part the ICU Defendants' Motion to Dismiss (Doc. 24).  The undersigned recommends that the Court GRANT the Motion to Dismiss as to Counts I (Medical Malpractice), VI (Fraud), VII (Intentional Infliction of Emotional Distress ("IIED")) and VIII (Interference with Business Relations) because those claims are barred by Ohio's statute of limitations for medical claims.  The Motion to Dismiss Count II (Wrongful Death) should be DENIED.  Also, the Motion to Dismiss Count I should be DENIED to the extent it seeks dismissal of that Count on the basis that Plaintiff's affidavit of merit does not satisfy Ohio Civ. R. 10(D)(2).


Dated: December 19, 2019                            */s/ Kathleen B. Burke*
                                                    Kathleen B. Burke
                                                    United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).